UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | Criminal No. 1:07-CR-00244-CKK |
| v. | : | |
| | : | |
| | : | |
| **AUBREY RANDOLPH SCOTT,** | : | |
| | : | |
| **Defendant** | : | |

GOVERNMENT'S NOTICE OF FILING
A LETTER FROM THE NATIONAL ACADEMY OF SCIENCES

The United States Attorney, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Notice of filing a letter written by James F. Hinchman, General Counsel of the National Academy of Sciences (NAS), explaining the impact of the defendant's crime upon the society.

Respectfully submitted,

Jeffrey A. Taylor
United States Attorney
D.C. Bar. 498610

BY:   */s/ Thomas E. Zeno*
   THOMAS E. ZENO
   Assistant United States Attorney
   D.C. Bar. No. 348623
   Fraud & Public Corruption Section
   555 4th St., N.W.
   Washington, D.C. 20530
   (202) 514-6957
   Thomas.Zeno@usdoj.gov

# NATIONAL ACADEMY OF SCIENCES
*THE NATIONAL ACADEMIES*

Office of the General Counsel

January 3, 2008

By Hand Delivery

The Honorable Colleen Kollar-Kotelly
United States District Court
   for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

      RE:   United States vs. Aubrey R. Scott, Criminal No. 07-244: Victim's Statement on Behalf of National Academy of Sciences

Dear Judge Kollar-Kotelly:

      We are writing on behalf of the National Academy of Sciences (NAS) as the victim of the substantial and continuous pattern of fraud committed by the Defendant Aubrey Scott.

      By way of background, the NAS is a tax-exempt federally chartered private corporation with its principal place of business in Washington, D.C. The Internal Revenue Service has determined that the NAS is a tax-exempt organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. Chartered by Congress in 1863, the NAS is a private self-perpetuating society of distinguished scholars engaged in scientific and engineering research, and it is dedicated to the furtherance of science and technology and their use for the general welfare. Members and foreign associates of NAS are elected in recognition of their distinguished and continuing achievements in original research. Of NAS's more than 2,000 members and 350 foreign associates, more than 190 have won Nobel Prizes. As a scientific society, NAS conducts membership meetings and other activities, including the publication of a major scientific journal, Proceedings of the National Academy of Sciences. The Institute of Medicine, the National Academy of Engineering, and the National Research Council all operate under the NAS's Congressional Charter.

      The principal activity of NAS is the performance of studies and other services for the primary benefit of the Federal government and the general public pursuant to the provision in its Congressional Charter that "[o]n request of the U.S. Government, the corporation shall investigate, examine, experiment, and report on any subject of science or art." The majority of NAS's activities are performed under cost-reimbursable no-fee awards from U.S. Government agencies and departments. Although Congress frequently enacts legislation requesting NAS

THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

2101 Constitution Avenue, NW
Washington, DC 20418

Phone: 202 334 2440
Fax:   202 334 1684

Judge Colleen Kollar-Kotelly
January 3, 2008
Page 2

studies, the Government plays no role in the selection of NAS members, officers, and directors or in the governance of the NAS, and NAS does not receive any direct appropriation from the Government.

Mr. Scott was the manager and most senior person in the NAS's Reprographics Center at the time he implemented the scheme to defraud the NAS. Under the NAS's procurement system, he was given signature authority over "micropurchases" (below $2500) for the Reprographics Center. Mr. Scott violated this trust by creating a sham company called Paper Perfect, and then used his signature authority to sign-off on false invoices he created, each of which was below the micropurchase threshold. Mr. Scott submitted hundreds of individual invoices in a deceitful scheme that defrauded the NAS out of thousands of dollars each month, at a time when he was generously compensated for the responsibilities which had been entrusted to him. Moreover, Mr. Scott's action directly impacted the numerous employees who depended upon Mr. Scott in his position of responsibility to be fair and honest. The many employees who worked for or with Mr. Scott all expressed shock and outrage when they learned about Mr. Scott's actions, and many felt as if they were as much of a victim of Mr. Scott's theft as NAS.

As a direct result of the pervasive fraud committed by Aubrey Scott, the NAS has suffered an enormous financial loss that comes at the direct expense of its Government and private programs. In addition to the substantial out of pocket loss in the amount of $1.2 million, the NAS has incurred substantial out-of-pocket expenses in excess of $250,000 in connection with its internal investigation, including retaining outside financial experts to conduct a comprehensive financial accounting of the loss, and retaining outside counsel to prepare a voluntary disclosure report for the cognizant Government authorities. Added to these out-of-pocket expenses is the substantial staff time and expense incurred in reviewing, revising, and restructuring internal controls, and the complete revalidation of the NAS's extensive master list of vendors.

Both as a nonprofit and a government contractor, the NAS has a special responsibility for the maintenance, use, and expenditure of its funds. The theft has come at the expense of the NAS's credibility as a responsible contractor, and constituted a serious breach of trust that the NAS places in its employees. A substantial portion of the money stolen by Mr. Scott was reimbursed by the U.S. government under the NAS's government contracts and grants in the form of inflated paper and supply costs. As a result, the NAS has informed the US Government of its commitment to repay the government for the full amount of its loss. The theft has also threatened to damage the NAS's reputation with its many supporters and contributors. For example, we have received a number of inquiries from foundations requesting an explanation of the impact of Mr. Scott's fraud on the NAS's financial condition.

Judge Colleen Kollar-Kotelly
January 3, 2008
Page 3

      Mr. Scott's breach of trust has required the institution to take measures to repair the damage to the institution's image, credibility and reputation in the eyes of its many sponsors and contributors who count on the institution's reputation for integrity when they support the charitable purposes of the institution.

      As a result, the NAS respectfully requests that the sentence imposed on Mr. Scott fully reflect the extensive damage that he has caused to the NAS. Mr. Scott's fraudulent conduct took place over a six-year period, all the while he was coming to work and accepting a paycheck, without any apparent consideration or remorse for the damage he has caused to one of the Nation's preeminent scientific organizations.

      We thank you for your consideration of these comments.

                                                      Sincerely,

                                                      James F. Hinchman
                                                    General Counsel
                                                    National Academy of Sciences

cc: Ms. Kelli Cave, U.S. Probation Officer
    Thomas Zeno, Esquire, Assistant U.S. Attorney
    Charles Chester, Esquire, Counsel for Defendant