**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA      :

          v.              :      **CRIMINAL NO.  07-244 (CKK)**

AUBREY RANDOLPH SCOTT     :

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully presents this memorandum in aid of sentencing.

### SUMMARY

From 2000 to 2006, defendant Scott executed a carefully planned fraud scheme during which he submitted more than one hundred of false vouchers to the National Academy of Sciences.  The defendant used his authority as supervisor of the reprographics department to approve payment of the vouchers and to keep them from being audited.  He spent the $1,231,108 in proceeds on items such as a BMW M5 automobile and jewelry as well as paying off the mortgage of his home.  The government recommends a sentence of 51 months incarceration, the bottom of the properly   calculated advisory guideline range.

### ARGUMENT

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence. Gall v. United States, 128 S.Ct. 586, 596 (2007).  This Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for

the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the Guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

      A.      The Sentencing Guidelines Remain a Crucial Aspect of Sentencing.

      The government's recommendation of a within-guideline sentence is based in part on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission, and serves the vital goal of uniformity and fairness in sentencing. While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 128 S.Ct. 558, 564 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 574 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).  The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough

approximation of sentences that might achieve § 3553(a)'s objectives.'" <u>Kimbrough</u>, 128 S.Ct. at 562-63 (quoting <u>Rita v. United States</u>, 127 S. Ct. 2456, 2465 (2007)).[1]

The advisory Guidelines are the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.  Reference to the Guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the randomness of the draw in judicial assignments. The section of <u>Booker</u> that makes the Guidelines advisory also explained that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, *helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary*." <u>Booker</u>, 543 U.S. at 264-65 (emphasis added).  The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as <u>Booker</u> explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process" through the Guidelines.  <u>Id.</u> at 263.

Therefore, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." <u>Gall</u>, 128 S.Ct. at 597 n.6.

---

[1]  In <u>Rita</u>, the Supreme Court held that an appellate court may presume that a within-guideline sentence is reasonable.  While this presumption does not apply before the district court, <u>Rita</u>, 127 S. Ct. at 2465, the Supreme Court's observation is informative that "the presumption reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case.  That double determination significantly increases the likelihood that the sentence is a reasonable one." <u>Id.</u> at 2463 (emphasis in original).

> It is also clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications. For even though the Guidelines are advisory rather than mandatory, they are, as we pointed out in <u>Rita</u>, the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions.

<u>Id.</u> at 594.[2]

In <u>Kimbrough</u>, which was issued on the same day as <u>Gall</u>, the Court emphasized the district courts' responsibility to consider the Sentencing Guidelines as a bulwark against disparate sentencing. The Court held that the Guidelines for crack cocaine offenses are advisory, and that a sentencing court in such a case may consider, among other factors, the criticism stated by the Sentencing Commission and others of those particular guidelines. Responding to an assertion that such case-by-case assessment of the propriety of the Guidelines may lead to significant disparity in sentencing, the Court emphasized the district courts' responsibility to avoid that result:

> Section 3553(a)(6) directs *district courts* to consider the need to avoid unwarranted disparities — along with other § 3553(a) factors — when imposing sentences. See *Gall, ante* . . . .

<u>Kimbrough</u>, 128 S.Ct. at 574 (emphasis in original). Recognition of the unique value of the Guidelines is the only available means of carrying out this mandate.

---

[2] The Court added: "If [the judge] decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one." <u>Id.</u> at 597.

Rather than encourage wholesale abandonment of guideline sentencing, <u>Kimbrough</u> narrowly focused on sentencing for crack cocaine offenses.  With respect to those offenses alone, the Court suggested that the Guidelines are not entitled to the ordinary respect given to the Sentencing Guidelines on the basis of the care and study put into them, given that the Sentencing Commission itself has condemned its own guidelines in this area.  Regarding any other offenses, the Supreme Court suggested that rejection of the suggested guidelines based only on an individual judge's disagreement with the formulation of the guidelines may not fare well on appeal, stating:  "while the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range 'fails properly to reflect §3553(a) considerations' even in a mine-run case." <u>Id</u>. at 563  (quoting <u>Rita</u>, 127 S. Ct. at 2465).  These statements reflect the fact that, ordinarily, the Sentencing Guidelines reflect the distillation of national sentencing experience and provide a useful measure for determining appropriate and consistent punishments.

    B.  <u>Proper Calculation of the Guideline Range Includes Both Adjustments.</u>

The government agrees with the Pre-Sentence Report that the adjustment for Abuse of Position of Trust applies under the circumstances of this case.  The government contends that the adjustment for Use of Sophisticated Means also applies.   For the reasons that follow, the adjustments should be applied despite the objections raised by the defendant.

<u>The Adjustment for Abuse of Position of Trust Applies.</u>

The defendant objects to application of the two-level adjustment for abuse of position of trust.  Although there can be no doubt that NAS trusted the defendant to its detriment (as described in its victim impact letter), the adjustment does not apply simply because a trusted

employee "handles property." United States v. Smaw, 22 F.3d 330, 332 (D.C. Cir. 1994)

(adjustment does not apply to time and attendance clerk).  In this case, however, the defendant

did more than merely handle property.  NAS gave the defendant authority to approve invoices

for micropurchases in amounts less than $2,500 each.  This ability to approve or deny invoices

without review by a supervisor involves the exercise of discretion to which the adjustment is

directed.  When approving micropurchases, the defendant was "subject to significantly less

supervision than employees whose responsibilities are primarily non-discretionary in nature."

Application Note 1 to § 3B1.3.  Moreover, the defendant also used his position as supervisor of

the reprographics department to prevent audits of invoices for paper products.[3]  Employees

under the defendant's supervision had to defer to the defendant's wishes in this regard.  When

the defendant used his position to approve payment of invoices as well as to prevent

reconciliation of the invoices for paper products, he "significantly facilitated the commission of

the offense," by concealing it from discovery.  Id.

　　　　Alternatively, the defendant erroneously contends that application of the adjustment

constitutes double counting because the element of an abuse of position of trust was considered

in the base offense level or specific offense characteristics of § 2B1.1.  Although the defendant's

conduct involved an abuse of position of trust, none of the adjustments in § 2B1.1 specifically

took that element into account.  When a guideline incorporates the element of an abuse of

position of trust, that fact is made clear in the commentary.  See, e.g., Application Note 6 to

§ 2C1.1; Application Note 4 to § 2C1.2; Application Note 1 to § 2C1.3.  In the absence of such a

---

　　　　[3]  See, Exhibit 1, the Affidavit of Carlton Stewart, who worked under the defendant in
the reprographics department and now is supervisor of the department.

note, application of a two level adjustment for abuse of a position of trust under § 3B1.3 does not constitute double counting in this case.

<u>The Adjustment for Sophisticated Means Applies.</u>

A two-level upward adjustment should be applied under § 2B1.1(b)(9)(C) because the defendant used "sophisticated means" in the commission of the offense through his creation and use of the shell company, Paper Perfect Reproductions, Inc. The defendant's conduct fits that described in Application Note 8(b) to § 2B1.1 which states that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

As the first step in his criminal scheme, the defendant ensured that Paper Perfect Reproductions, Inc., was incorporated in the state of Delaware on March 20, 2000. The defendant did not accomplish this incorporation directly, but rather paid a registered agent located in Delaware to do the work. Thus, the Certificate of Incorporation does not include a reference to the defendant's name; and anyone examining the certificate would not find the connection between the defendant and the company.

On April 10, 2000, within three weeks of the incorporation, the defendant established a crucial function of the shell company – a corporate bank account. In the application to First Union bank for a "business checking" account, he certified that the Board of Directors had authorized creation of the bank account. The defendant listed himself as President of the company; and, although inaccurately listing the company as incorporated in Maryland, he reported the "date of birth" of the company as March 20, 2000, the actual date of incorporation.

On April 12, 2000, the defendant obtained use of phone number 202-288-1151.  This number  appeared as the customer service number for Paper Perfect Reproductions on the early invoices which he submitted to the National Academy of Sciences (NAS).  On later invoices the phone number was replaced by a working email address that the defendant established at paperperfect@verizon.net.

On May 19, 2000, the defendant opened a rented mailbox at 4200 Wisconsin Avenue, N.W.  On the form "Application for Delivery of Mail," the defendant identified himself as an officer of Paper Perfect Reproductions who was obtaining the mailbox on behalf of the corporation.  Where the form required the defendant to identify the state in which the company had been registered and the date of registration, the defendant wrote "Delaware, 3-30-2000."  On the form "Mailbox Service Agreement," the defendant listed his company as Paper Perfect Reproductions.

It was only after he had finished each of these steps in the creation of the shell corporation, that the defendant began submitting invoices to the National Academy of Sciences (NAS).  The first check sent by NAS to Paper Perfect Reproductions was issued on June 7, 2000, in the amount of $1,370.  It was mailed to 4200 Wisconsin Avenue by using the United States Postal Service.  It was not the last such check.

Between June 2000 and April 2006, NAS mailed a total of one hundred and eight (108) checks to the company totaling $ 1,211,033.00.  The defendant deposited these checks into the corporate account.  For instance, bank records of Wachovia (which acquired First Union) show that between August 1, 2001 and March 3, 2007, checks from NAS in the amount of $1,059,291.00 were deposited into the account.  The NAS checks were the sole source of

deposits to the Wachovia account of Paper Perfect Reproductions.  Furthermore, the defendant used an endorsement stamp that said:

> Pay to the Order of
> First Union Nation Bank
> For Deposit Only
> Paper Perfect Reproductions
> [account number]

By using this corporate stamp, the defendant was able to endorse and deposit the NAS checks without using his own signature.  This ensured that no one at NAS would raise questions about why the defendant's name would have endorsed the cancelled checks returned to NAS.

The fraudulent nature of Paper Perfect Reproductions is underscored by an examination of the disbursements from the corporate bank account.  For instance, between August 1, 2001 and March 3, 2007,  no disbursements were made for business expenses, such as supplies, payroll, and other items normally associated with an ongoing business concern.  Instead, the defendant spent the money obtained from NAS for his personal enrichment.  For instance, the defendant wrote seven checks payable to Wells Fargo Home Mortgage totaling $163,458.37 in order to pay down the mortgage on his home.  The defendant also wrote a corporate check in the amount of $57,000.00 to purchase a 2006, sapphire grey, BMW M5 automobile.  Other examples include checks the defendant wrote to purchase $26,570.10 worth of jewelry.

Further proof that Paper Perfect Reproductions was a shell company comes from the fact that the defendant paid to renew the incorporation of the company in Delaware until he was terminated from NAS for reasons unrelated to the fraud scheme.  After he was terminated, the defendant allowed the incorporation to lapse.  Similarly, the defendant renewed his contract for

the rental mailbox every six months until he was discharged from NAS, at which point he let the

contract lapse.

The defendant argues that his conduct was not sophisticated the conduct was inextricably

intertwined in his crime because creation of the shell company was necessary to the fraud itself.[4]

A similar argument was presented by the defendant in United States v. Finck, 407 F.3d 908 (8th

Cir.), cert. denied, 546 U.S. 914 (2005), who said that "he used means no more sophisticated

than what is expected of a scheme to defraud." Id. at 915. In response, the Eighth Circuit held:

> While Finck did not use sophisticated means to conceal his
> criminal activity, we find that he used sophisticated means to
> execute his scheme. Repetitive and coordinated conduct, though
> no one step is particularly complicated, can be a sophisticated
> scheme." Id.

The defendant in the instant case could have committed this offense without the creation of the

shell company. He could have submitted false invoices on the bogus letterhead; he could have

used his home address as the mailing address for the checks; and he could have deposited the

NAS checks into his personal bank account after negotiating them with his personal signature.

Rather than choose this simpler way to commit his fraud, the defendant took the elaborate steps

described above to create, maintain, and use the shell company as a buffer against discovery. In

United States v. Halloran, 415 F.3d 940 (8th Cir. 2005), the Eighth Circuit upheld application of

the adjustment even though the defendant used only office machines like a typewriter and a fax

machine to create a shell company and execute his scheme. The court held certain aspects of the

---

[4] The defendant's reliance upon United States v. Barakat, 130 F.3d 1448 (11th Cir. 1997),
is misplaced because the Eleventh Circuit merely held that an abuse of position of trust in the
underlying fraud could not be attributed to the crime of tax fraud committed after the underlying
fraud was finished. Id. at 1455. In the instant case, the adjustment is being considered for the
"underlying offense" of mail fraud. There is no tax fraud conviction.

fraud were not complex or intricate but they nonetheless constituted part of a "multi-layered

plot" involving a corporate front, numerous false documents, forged signatures, and fictitious

property transfers.  Id. at 943, 945.

       The conclusion that sophisticated means were involved in the instant case is not affected

by the ease with which the defendant was identified once the scheme unraveled.  At some point

in any scheme the criminal must bring the money under his control in order for him to benefit

from it.  That is why fraud cases often are solved by following the money.  In United States v.

Fife, 71 F.3d 750 (7th Cir. 2006), cert. denied, 127 U.S. 3020 (2007), the defendants claimed that

they could not have used sophisticated means because if they

              intended  to conceal taxable income, creating corporations with
              Federal ID numbers would be the "dumbest" thing they could do.
              This argument confuses "sophisticated" for "intelligent."   The
              sophisticated means enhancement does not require a brilliant
              scheme, just one that displays a greater level of planning or
              concealment than the usual tax evasion case.  United States v.
              Kontny, 238 F.3d 815, 821 (7th Cir.2001) ("In light of its purpose
              and context, we think 'sophistication' must refer not to the
              elegance, the 'class,' the 'style' of the defrauder - the degree to
              which he approximates Cary Grant-but to the presence of efforts at
              concealment that go beyond ... the concealment inherent in tax
              fraud.");  United States v. Minneman, 143 F.3d 274, 283 (7th
              Cir.1998);  United States v. Madoch, 108 F.3d 761, 766 (7th
              Cir.1997).

471 F.3d at 753-754.[5]

_____

        [5]  Although Fife involves the tax guideline, the definition of "sophisticated means" in
that guideline is identically worded to portions of the definition in § 2B1.1.  Commentary Note 4
to   § 2T1.1 provides:

              4.  Sophisticated Means Enhancement. - For purposes of
              subsection (b)(2), "sophisticated means" means especially
              complex or especially intricate offense conduct pertaining to the
              execution or concealment of an offense.  Conduct such as hiding

Similarly, in United States v. Small, 210 Fed. Appx. 776 (10th Cir. 2006)(unpublished), the Tenth Circuit decided the appeal of a defendant who had created "several shell corporations to perpetrate" a fraud in which the loss exceeded $37 million. Id. at 779. In rejecting the defendant's argument that the sophistication of a scheme is determined by the ease with which it is discovered, the Court said:

> We also reject [defendant]'s contention that the fraud could not be sophisticated because it was detected by a loan processor who noticed unusual patterns and relationships in the data. To the contrary, we think that this case was tailor-made for a sophisticated means enhancement even though the fraud was readily-detectible once the pieces of the puzzle were put together."

Id. at 782. The defendant's conduct in this instant case similarly is tailor-made for the adjustment for sophisticated means.[6]

C. 3553(a) Factors Support Imposition of a Sentence Within the Advisory Guideline Range.

For the above reasons, the correctly calculated advisory guideline range deserves significant respect. To be clear, the government recognizes that the Guidelines are entirely advisory, and that a district court has discretion to vary from an advisory range, subject only to deferential appellate review for reasonableness. However, our point is that a district court must consider the guideline range, see § 3553(a)(4), and is usually well advised to follow the Sentencing Commission's advice, in order to assure fair, proportionate, and uniform sentencing

---

assets or transactions, or both, through the use of corporate shells, or offshore financial accounts ordinarily indicates sophisticated means.

[6] Because corporate shells were not used in United States v. Bhagavan, 911 F. Supp. 351 (N.D. Ind. 1995), or United States v. Utecht, 238 F.3d 882 (7th Cir. 2001), defendant's reliance upon them is misplaced.

of criminal offenders.  Moreover, as explained below, other 3553(a) factors support imposition

of a sentence within the guideline range.  Accordingly, the government respectfully recommends

a sentence of 51 months imprisonment.

Nature and circumstances of the offense

The nature and circumstances of the offense are consistent with the period of

incarceration recommended by the Guidelines.   The defendant executed a deliberate and

calculated fraud scheme involving more than one hundred false invoices submitted to NAS

during a six-year span of criminal activity.  As a result, the defendant obtained more than $1.2

million from a nonprofit, scientific society for which he was employed as supervisor of the

reproduction department.  Furthermore, during the course of his crime, the defendant employed

sophisticated planning and abused of his position of trust with NAS.

History and characteristics of the defendant

The defendant's commitment to his family is commendable.  Also commendable is his

ability to overcome some difficulties he encountered while growing up.  By the time he began

his criminal scheme, however, the defendant had become a responsible adult with an advanced

education and gainful employment.

Every defendant can point to something about his age, education, physical condition, and

employment history which distinguishes him from others.  The normal differences which occur

among individuals in these areas, however, should not be the basis for one judge to impose a

harsh sentence whereas another judge would impose a lenient sentence.  For instance, this case

does not justify a sentence imposed above the guideline range because the defendant is a mature

individual who has had sufficient benefits and success in his life, despite some disappointments,

to know that he does not need to earn money through criminal behavior. Neither should a sentence be imposed below the guideline range because nothing about his life experiences constitutes an excuse for his criminal behavior. The Sentencing Commission has developed a balanced approach in which individual characteristics are not ordinarily sufficient to justify sentences outside the guideline range otherwise applicable to the defendant.

Under the circumstances of this case, the effects of incarceration upon the defendant's family is not a basis for a non-guidelines sentence. As the Sentencing Commission recognized, see U.S.S.G. § 5H1.6, inconvenience and even harm to a criminal defendant's family are normal results of a criminal act, and ordinarily do not warrant leniency. The Commission's judgment is sound. Such leniency should not be afforded here, given the severity of the defendant's offenses, the need for the Court to avoid disparate sentences for like offenders, and the fact that the defendant's family has the means to maintain itself in his absence.

The particulars of cases cited by the defendant differ sharply from his own situation. In United States v. Milne, 384 F. Supp.2d 1309 (E.D. Wis. 2005), the defendant voluntarily disclosed his crime, gave up all the equity in his home as restitution, and committed the crime in order to save his business rather than to finance a lavish lifestyle. Id. at 1310. In addition, the defendant obtained only $500,000 in proceeds. Id. at 1309. Nonetheless, the court felt imprisonment was necessary to promote respect for the law and to deter others, and therefore reduced the guideline range only by one level. Id. at 1311.

The decisions in Abbadessa and Concepcion arose out of public corruption and welfare fraud conspiracies involving dozens of defendants as well as uncharged but suspect individuals. The defendants constituted a continuum of culpability, including those who had cooperated with

the government.  Family cohesion was one of a number of considerations evaluated by the court in sentencing the numerous defendants.  However, the court had no hesitation in sentencing the most culpable defendants without a reduction for the defendants' backgrounds.  In Abbadessa, a supervisor in the Taxi and Limousine Commission received a sentence which was only one month below his guideline range despite his cooperation.  "[H]e would have received the maximum sentence had he not cooperated with the government."  United States v. Abbadessa, 848 F. Supp. 369 (E.D. N.Y. 1994).   Similarly, the court imposed a guideline sentence of forty-six months incarceration on defendant Ogirri, one of the most culpable people involved in the welfare fraud.  The sentence was imposed in part because she had misused her government position during the fraud.  Her sentence too would have been higher had she not cooperated. United States v. Concepcion, 795 F. Supp. 1262, 1298-1299 (E.D.N.Y. 1992).[7]

Sentence Which Reflects the Offense, Promotes Respect for Law, and Provides Just Punishment

The Guidelines reflect the new consensus that those convicted of economic crimes should not be able to avoid incarceration, even where such crimes constitute the defendant's first offense.  The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the goals of the legislation was to correct what Congress saw as a significant problem in the criminal justice system: the fact that "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that

---

[7]   The defendant's request for a non-guidelines sentence on the basis of his cooperation and agreement to pay some restitution is misplaced.  Defendant Scott contends he has been cooperative because of his prompt guilty plea; and for that he has received the benefit of a three level reduction in his guideline range.  In addition, the government recommends a sentence at the bottom of the guideline range.  The defendant deserves no further reduction.  His conduct is different from the substantial assistance type of cooperation considered in Abbadessa and Concepcion.

reflect the seriousness of their offenses." U.S.C.C.A.N., 98th Congress, 2nd Sess. (1984) at 3260.

As Justice Breyer, one of the Sentencing Commission's original members, has explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 20 (1988). This approach provides just punishment for the considerable harm that white collar crimes cause society.

<u>Need for Deterrence and to Protect the Public from the Defendant's Further Crimes</u>

As is the situation with many first time white collar offenders, it is unlikely that the defendant will commit additional crimes in the future. This reduces the need for specific deterrence of the defendant through imposition of a harsher sentence than normal. However, the need for general deterrence remains high in this situation. The community needs to know not only that white collar criminals receive just punishment, as described above, but that the sentence will deter future crimes by others.[8] If the theft of more than $1.2 million under the

---

[8] Although the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," the Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having

-16-

circumstances of this case does not result in a significant punishment, others may be emboldened to commit crimes that they would avoid if they feared punishment. In this regard defendant's reliance upon United States v. Carey, 368 F. Supp.2d 891 (E.D. Wis. 2005) seems misplaced. The court imposed a sentence of incarceration within the modified range which the court found applicable to that defendant. In doing so, the court rejected the request for a non-guidelines sentence because of "the nature of the offense and the need to deter others." Id. at 895.

Need to provide Educational or Vocational training, Medical Care, or Correctional Treatment

The defendant has no need for special treatment in this regard. He already has a college education and vocational skills developed through nearly thirty years of employment. Similarly, he has no unusual health conditions.

Avoiding Unwarranted Disparities Among Defendants with Similar Records and Conduct

In this area, the Guidelines provide unparalleled assistance to the Court. Because they have been crafted by an expert Sentencing Commission based upon the average sentences given by judges in thousands of cases, the Guidelines provide a neutral measure that can be used to compare defendants and the crimes which they commit. In Rita the Supreme Court held that the Guidelines "seek to embody the §3553(a) considerations, both in principle and in practice." Id. at 2464.

> The upshot is that the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale.

Id. at 2463.

---

explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

Need to Provide Restitution to Victims

Because the defendant has consented to forfeiture of real estate and personalty in this case, he has made it possible for the NAS to obtain some percentage of restitution immediately. The remainder of the restitution can be addressed through an order of the Court. Although the defendant cannot repay NAS significantly during the time he is incarcerated, immediate repayment of the defendant's debt is not the only consideration in a criminal case. Even in the case cited by the defendant, United States v. Peterson, 363 F.Supp.2d 1060 (E.D. Wis. 2005), the court "d[id] not suggest that a defendant should receive a break just because he owes restitution." Id. at 1062. Rather, the debt must be weighed against the other sentencing factors. In Peterson, the court imposed a non-guidelines sentence in order to permit treatment for a gambling addiction and payment of restitution – which was only $81,500. Id. at 1061. In fashioning the sentence, however, the Court found the guideline range of 12 to 18 months reasonable. In acknowledging the reasonable sentence suggested by the Guidelines, the court ensured that the period of community confinement and home confinement totaled twelve months so that the combination fell within the guideline range. Id. at 1063. That approach was harmonious with the Guidelines which allow such splits for short sentences. Peterson does not justify giving defendant Scott a non-guidelines sentence in the very different circumstances of the instant case.

-18-

<u>CONCLUSION</u>

The Court should use its discretion to stay within the guideline range.  The government recommends a sentence at the bottom of the range, a sentence of 51 months incarceration.

Respectfully submitted,


JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No.  498610


/s/ *Thomas E. Zeno*
_____
THOMAS E. ZENO
 D.C. Bar. No. 348623
Assistant United States Attorney
Fraud & Public Corruption Section
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-6957
Thomas.Zeno@usdoj.gov

IN THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )   Criminal No. 07-244 |
| | ) |
| | ) |
| Aubrey R. Scott, | ) |
| | ) |
|     Defendant. | ) |
| | ) |
| | ) |

**AFFIDAVIT OF CARLTON STEWART**

I, Carlton Stewart, the undersigned, hereby solemnly swear and affirm under the penalties of perjury that I am a witness of lawful age having personal knowledge of the following:

1. I am currently the supervisor of the reprographics department at the National Academy of Sciences ("NAS"). I am responsible for the day-to-day operations of the reprographics centers and associated copiers throughout NAS. I have worked approximately 15 years for NAS. I left the NAS for a brief period of time beginning in February 2006 and returned to work at the NAS in June of 2006.

2. During the period prior to February 2006 when Aubrey Scott was manager of the reprographics center, Diamond Paper was NAS's primary supplier for paper and other related copy supplies.

3. During that time period, the paper shipments received from Diamond Paper included packing slips. When I gave these slips to Mr. Scott, he would throw them away. I

asked Mr. Scott how he intended to verify the receipt of the supplies and services

without the packing slips.  Mr. Scott told me not to worry about it.

4.  Diamond Paper usually delivered forty (40) boxes of regular paper and twenty (20)

boxes of three-hole paper twice per week.

5.  During the same time period, I did not see any packing slips or invoices from Paper

Perfect, nor did I ever see any paper or material delivered by Paper Perfect.  When I

reviewed the fraudulent Paper Perfect invoices after the theft by Mr. Scott was

uncovered, it was clear that some of the items on those invoices were not used by

NAS in reprographics.

I SOLEMNLY AFFIRM under penalties of perjury and upon personal knowledge that the

contents of the foregoing affidavit are true.


_1/18/2008_
Date

_Carlton Stewart_
Carlton Stewart


District of Columbia, to wit:

I HEREBY CERTIFY, that on this __18th__ day of __January__, 2008, before
me, the undersigned Notary Public in and for the District of Columbia, personally
appeared Carlton Stewart, who affixed his signature hereto and provided proof of
identity.

WITNESS my hand and Notarial Seal.

_____
Notary Public

My commission expires:
[SEAL]

Janice M. Simms
Notary Public, District of Columbia
My Commission Expires 4-30-2010

My commission expires: _4-30-2010_ .

2