HONORABLE COLLEEN KOLLAR-KOTELLY, UNITED STATES DISTRICT JUDGE

**FILED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEB - 8 2008

NANCY MAYER WHITTINGTON, CLERK
U S DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Docket No.: 07-CR-244 |
| vs. | : | SSN: |
| SCOTT, Aubrey Randolph | : | Disclosure Date: November 28, 2007 |

## RECEIPT AND ACKNOWLEDGMENT OF PRESENTENCE INVESTIGATION REPORT

This is to acknowledge that each of the undersigned has received and reviewed the Presentence Investigation Report (PSR) in the above-entitled case. The undersigned further acknowledges that:

### For the Government

(CHECK APPROPRIATE BOX)
(✓) There are no material/factual inaccuracies therein.
( ) There are material/factual inaccuracies in the PSI report as set forth in the attachment herein.

_____Thomas Zeno_____                                   _____Dec 14, 2007_____
Prosecuting Attorney                                                                Date

### For the Defendant

(CHECK APPROPRIATE BOX)
( ) There are no material/factual inaccuracies therein.
(✗) There are material/factual inaccuracies in the PSI report as set forth in the attachment.

_____[signature]_____ 11-28-07                            _____[signature]_____ 2/8/08
Defendant Counsel            Date                                      Defense Counsel            Date

## NOTICE OF OBLIGATION OF THOSE EXECUTING THIS FORM

Pursuant to Local Rule 32(f)(2), those executing this form shall first submit any material inaccuracies or disputes in writing by December 15, 2007, to U.S. Probation Officer Kelli Griffin Cave, telephone number (202) 565-1357, fax number (202) 273-0242.

Pursuant to Rule 32(b)(6)(B), effective December 1, 1994, it shall be the responsibility of the Attorney for the Government and the Defense Counsel to provide each other with a copy of the objections at the same time the objections are filed with the probation office.

FOR THE COURT

By:   Gennine A. Hagar, Chief
      United States Probation Officer

Government's objections to PSR of Aubrey Scott

A 2-level upward adjustment should be applied under § 2B1.1(b)(9)(C) because the defendant used "sophisticated means" in the commission of the offense through his creation and use of the shell company, Paper Perfect Reproductions, Inc. The defendant's conduct fits that described in Application Note 8(b) to § 2B1.1 which states that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

As the first step in his criminal scheme, the defendant ensured that Paper Perfect Reproductions, Inc., was incorporated in the state of Delaware on March 20, 2000. The defendant did not accomplish this incorporation directly, but rather paid a registered agent located in Delaware to do the work. Thus, the Certificate of Incorporation does not include a reference to the defendant's name; and anyone examining the certificate would not find the connection between the defendant and the company.

On April 10, 2000, within three weeks of the incorporation, the defendant established a crucial function of the shell company – a corporate bank account. In the application to First Union bank for a "business checking" account, he certified that the Board of Directors had authorized creation of the bank account. The defendant listed himself as President of the company; and, although inaccurately listing the company as incorporated in Maryland, he reported the "date of birth" of the company as March 20, 2000, the actual date of incorporation.

On April 12, 2000, the defendant obtained use of phone number 202-288-1151. This number appeared as the customer service number for Paper Perfect Reproductions on the early invoices which he submitted to the National Academy of Sciences (NAS). On later invoices the

phone number was replaced by a working email address that the defendant established at paperperfect@verizon.net.

On May 19, 2000, the defendant opened a rented mailbox at 4200 Wisconsin Avenue, N.W. On the form "Application for Delivery of Mail," the defendant identified himself as an officer of Paper Perfect Reproductions who was obtaining the mailbox on behalf of the corporation. Where the form required the defendant to identify the state in which the company had been registered and the date of registration, the defendant wrote "Delaware, 3-30-2000." On the form "Mailbox Service Agreement," the defendant listed his company as Paper Perfect Reproductions.

It was only after he had finished each of these steps in the creation of the shell corporation, that the defendant began submitting invoices to the National Academy of Sciences (NAS). The first check sent by NAS to Paper Perfect Reproductions was issued on June 7, 2000, in the amount of $1,370. It was mailed to 4200 Wisconsin Avenue by using the United States Postal Service. It was not the last such check.

Between June 2000 and April 2006, NAS mailed a total of one hundred and eight (108) checks to the company totaling $ 1,211,033.00. The defendant deposited these checks into the corporate account. For instance, bank records of Wachovia (which acquired First Union) show that between August 1, 2001 and March 3, 2007, checks from NAS in the amount of $1,059,291.00 were deposited into the account. The NAS checks were the sole source of deposits to the Wachovia account of Paper Perfect Reproductions. Furthermore, the defendant used an endorsement stamp that said:

> Pay to the Order of
> First Union Nation Bank
> For Deposit Only
> Paper Perfect Reproductions
> [account number]

By using this corporate stamp, the defendant was able to endorse and deposit the NAS checks without using his own signature. This ensured that no one at NAS would raise questions about why the defendant's name would have endorsed the cancelled checks returned to NAS.

The fraudulent nature of Paper Perfect Reproductions is underscored by an examination of the disbursements from the corporate bank account. For instance, between August 1, 2001 and March 3, 2007, no disbursements were made for business expenses, such as supplies, payroll, and other items normally associated with an on-going business concern. Instead, the defendant spent the money obtained from NAS for his personal enrichment. For instance, the defendant wrote seven checks payable to Wells Fargo Home Mortgage totaling $163,458.37 in order to pay down the mortgage on his home. The defendant also wrote a corporate check in the amount of $57,000.00 to purchase a 2006, sapphire grey, BMW M5 automobile. Other examples include checks the defendant wrote to purchase $26,570.10 worth of jewelry.

Further proof that Paper Perfect Reproductions was a shell company comes from the fact that the defendant paid to renew the incorporation of the company in Delaware until he was terminated from NAS for reasons unrelated to the fraud scheme. After he was terminated, the defendant allowed the incorporation to lapse. Similarly, the defendant renewed his contract for the rental mailbox every six months until he was discharged from NAS, at which point he let the contract lapse.

In his objections to the PSR, the defendant argues that his conduct was not sophisticated because he did not create a secondary office, bank account or separate companies that would have concealed the offense more effectively. He maintains no sophistication was involved in his crime because creation of the shell company was necessary to the fraud itself. A similar argument was presented by the defendant in United States v. Finck, 407 F.3d 908 (8th Cir.), cert. denied, 546 U.S. 914 (2005), who said that "he used means no more sophisticated than what is expected of a scheme to defraud." Id. at 915. In response, the Eighth Circuit held:

> While Finck did not use sophisticated means to conceal his criminal activity, we find that he used sophisticated mea ns to execute his scheme. Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." Id.

The defendant in the instant case could have committed this offense without the creation of the shell company. He could have submitted false invoices on the bogus letterhead; he could have used his home address as the mailing address for the checks; and he could have deposited the NAS checks into his personal bank account after negotiating them with his personal signature. Rather than choose this simple way to commit his fraud, the defendant took the elaborate steps described above to create, maintain, and use the shell company as a buffer against discovery.

The conclusion that sophisticated means were involved in the instant is not affected by the ease with which the defendant was identified once the scheme unraveled. At some point in any scheme the criminal must bring the money under his control in order for him to benefit from it. That is why fraud cases often are solved by following the money. In United States v. Small, 210 Fed. Appx. 776 (10th Cir. 2006), the Tenth Circuit decided the appeal of a defendant who had created "several shell corporations to perpetrate" a fraud in which the loss exceeded $37

4

million. Id. at 779. In rejecting the defendant's argument that the sophistication of a scheme is determined by the ease with which it is discovered, the Court said:

> We also reject [defendant]'s contention that the fraud could not be sophisticated because it was detected by a loan processor who noticed unusual patterns and relationships in the data. To the contrary, we think that this case was tailor-made for a sophisticated means enhancement even though the fraud was readily-detectible once the pieces of the puzzle were put together." Id. at 782.

The defendant's conduct in this instant case similarly is tailor-made for the adjustment for sophisticated means.